No. 26-40605

IN THE
United States Court of Appeals for the Fifth Circuit

In re JAMAAL HOWARD,
*Movant*.

**OPPOSITION TO MOTION FOR AUTHORIZATION AND MOTION FOR A STAY OF EXECUTION**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

AMBER PLATT
Deputy Attorney General
For Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division

JENNIFER WREN
Assistant Attorney General
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
jennifer.wren@oag.texas.gov

*Counsel for Respondent*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Respondent*

Eric Guerrero, Director
TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

*Counsel for Respondent*

Jennifer Wren, Assistant Attorney General, Criminal Appeals Division
OFFICE OF THE ATTORNEY GENERAL OF TEXAS

*Movant*

Jamaal Howard

*Counsel for Movant*

Jeffrey R. Newberry
Don Bailey

s/ Jennifer Wren
JENNIFER WREN
Assistant Attorney General

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......... i
TABLE OF CONTENTS .......... ii
TABLE OF AUTHORITIES ..........
NTRODUCTION .......... 1
STATEMENT OF JURISDICTION .......... 2
STATEMTN OF THE ISSUE .......... 3
STATEMENT OF THE CASE .......... 3
I. Facts of the Crime .......... 3
II. Punishment Evidence .......... 4
III. Competency Evaluations at Trial .......... 4
A. Dr. James Duncan: court-appointed clinical psychologist .......... 6
B. Dr. Richard Fason: defense expert .......... 8
C. Dr. Ned Groves: state psychiatric expert .......... 10
D. Dr. Edward Gripon .......... 11
IV. Procedural History .......... 12
SUMMARY OF THE ARGUMENT .......... 15
STANDARD OF REVIEW .......... 16
I. The Statue of Limitations Precludes Authorization .......... 17
II. Howard's Motion Does Not Meet the Standards Under 28 U.SC. 2244 for Filing a Successive Habeas Corpus Petition .......... 23
A. Howard's presentation of his Atkins claim "in a prior application implicates 2233(b)(1)'s absolute bar against successive petitions .......... 24
B. Alternatively, Howard's Atkins claim is barred by 2244(b)(2)(A) because it does not rely on a new retroactive rule of constitutional law .......... 28
C. Howard's claim fails on the merits .......... 36
III. This Court Should Deny Howard's Request for a Say of Execution .......... 44
CONCLUSION .......... 48
CERTIFICATE OF SERVICE .......... 50
CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .......... 51
ELECTRONIC CASE FILING CERTIFICATIONS .......... 51

# TABLE OF AUTHORITIES

## Cases

*Adams v. Thaler*,
679 F.3d 312 (5th Cir. 2012) ........ 16
*Barefoot v. Estelle*,
463 U.S. 880 (1983) ........ 45
*Brumfield v. Cain*,
808 F.3d 1041 n. 27 (5th Cir. 2015) ........ 42
*Bucklew v. Precythe*,
587 U.S. 119 (2019) ........ 47
*Burton v. Stewart*,
549 U.S. 147 (2007) ........ 26
*Busby v. Davis,*
925 F.3d 699 (5th Cir. 2019) ........ 36, 41
*Cantu v. Collins*,
967 F.2d 1006 (5th Cir. 1992) ........ 44
*Dunn v. Reeves*,
594 U.S. 731 (2021) ........ 42, 43
*Ex parte Blue,*
230 S.W.3d 151 (Tex. Crim. App. 2007) ........ 36
*Ex parte Briseno*,
135 S.W.3d 1 (Tex. Crim. App. 2004) ........ 14, 30
*Ex parte Cathey*,
451 S.W.3d 12 ........ 41, 42, 43, 42
*Ex parte Estrada*,
2025 WL 1122323, at *1 ........ 21, 22, 20
*Ex parte Howard*,
No. WR-77,906-01, 2012 WL 6200688 (Tex. Crim. App. Dec. 12, 2012) ........ 12
*Ex parte Mays*,
686 S.W.3d 745 (Tex. Crim. App. 2024) ........ 20, 28
*Felder v. McVicar*,
113 F.3d 696 (7th Cir. 1997) ........ 26
*Felker v. Turpin*,
518 U.S. 651 (1996) ........ 16

*Gomez v. U.S. Dist. Court for Northern Dist of California,*
503 U.S. 653 (1992) .......... 46
*Gonzalez v. Crosby*,
545 U.S. 524 (2005) .......... 25
*Guerrero v. Johnson*,
No. 25-1003 (U.S. cert. granted June 15, 2026) .......... 44
*Hall v. Florida*,
572 U.S. 701 (2014) .......... 29, 32, 34
*Henderson v. Thaler*,
626 F.3d 773 (5th Cir. 2010) .......... 18
*Hill v. McDonough,*
547 U.S. 573 (2006) .......... 45, 46
*Hilton v. Braunskill*,
481 U.S. 770 (1987) .......... 45
*Holland v. Florida*,
560 U.S. 631 (2010) .......... 17
*Howard v. Davis*,
959 F.3d 168 (5th Cir. 2020) .......... 15
*Howard v. Lumpkin*,
592 U.S. 1180 (2021) .......... 15
*Howard v. Stephens*,
No. 1:13-cv-256, 2019 WL 4573640 (E.D. Tex. 2019) .......... 14
*In re Burton*,
111 F. 4th 664 (5th Cir. 2024) .......... 18, 19
*In re Campbell*,
750 F.3d 523 .......... 18, 23, 36
*In re Cathey*,
857 F.3d 221 (5th Cir. 2017) .......... 22, 24, 31, 40
*In re Coleman*,
768 F.3d 367 (5th Cir. 2014) .......... 27
*In re Johnson,*
935 F.3d 284 (5th Cir. 2019) .......... passim
*In re Jones,*
998 F.3d 187 (5th Cir. 2021) .......... 18, 19
*In re Mathis*,
483 F.3d 395 (5th Cir. 2007) .......... 41
*In re Sharp*,
969 F.3d 527 (5th Cir. 2020) .......... 25

*In re Soliz*,
938 F.3d 200 (5th Cir. 2019) .......... 32
*In re Sparks*,
939 F.3d 630 (5th Cir. 2019) .......... 18, 19
*In re Young*,
789 F.3d 518 n.2 (5th Cir. 2015) .......... 27
*Montgomery v. Goodwin*,
841 F. App'x 700 (5th Cir. 2021) .......... 26
*Moore v. Texas*, *(Moore I)*,
581 U.S. 1 (2017) .......... passim
*Moore v. Texas*,
586 U.S. 590 (2019) .......... 19
*Nelson v. Campbell*,
541 U.S. 637 (2004) .......... 45, 46
*Nken v. Holder*,
556 U.S. 418 (2009) .......... 45
*Petetan v. State*,
622 S.W.3d 321 (Tex. Crim. App. 2021) .......... 37, 42
*Shinn v. Ramirez*,
596 U.S. 366 (2022) .......... 26
*Shoop v. Hill*,
586 U.S. 45 (2019) .......... 19
*United States v. Vargas-Soto*,
35 F.4th 979 .......... 25
*Walker v. Epps*,
287 F. App'x 371 (5th Cir. 2008) .......... 47
*Williams v. Thaler,*
602 F.3d 291 (5th Cir. 2010) .......... 23

**Constitutional Provisions & Statutes**

28 U.S.C. § 2244 .......... ii, 13, 23, 32
28 U.S.C. § 2244(b) .......... passim
28 U.S.C. § 2244(b)(1) .......... passim
28 U.S.C. § 2244(b)(2)(A) .......... passim
28 U.S.C. § 2244(b)(2)(B) .......... 16
28 U.S.C. § 2244(b)(3) .......... 26
28 U.S.C. § 2244(b)(3)(A) .......... 2, 16

28 U.S.C. § 2244(b)(3)(C) ........ 17
28 U.S.C. § 2244(d) ........ 17
28 U.S.C. § 2244(d)(1) ........ 16, 18, 19
28 U.S.C. § 2244(d)(1)(C) ........ 19
28 U.S.C. § 2244(d)(1)(D) ........ 19, 22
Tex. Code Crim. Proc. art. 46B.024 ........ 6

**Rules & Regulations**

Fed. R. App. P. 32(a) ........ 51

## INTRODUCTION

Jamaal Howard was convicted and sentenced to death in 2001 for the capital murder of Vickie Swartout. The state trial court scheduled Howard to be executed after 6:00 p.m. (Central Time) on October 7, 2026.

Twenty-six years after the commission of this crime, nine years after he abandoned his first *Atkins*[1] claim in federal district court, and seven days before his scheduled execution, Howard filed a motion for authorization to file a successive petition raising an intellectual-disability claim, arguing the previous factual and legal unavailability of such a claim in his first federal habeas petition. But Howard fails to show that his *Atkins* claim was previously unavailable when he abandoned it in federal district court. Howard's *Atkins* claim is also unequivocably barred by the statute of limitations even if his claim was previously unavailable, and he makes no serious argument for equitable tolling. This Court has consistently time-barred *Atkins* claims dilatorily presented in the last minute before a scheduled execution, and Howard's claim is unusually dilatory. *Atkins* itself has been available for over two decades, and the cases and literature that Howard relies upon for the

[1] *Atkins v. Virginia*, 536 U.S. 304 (2002).

latest iteration of his claim have largely been available for years. In fact, Howard has sat on his hands with no litigation pending since certiorari was denied after initial federal habeas in 2021. Accordingly, the Court should deny Howard's motion for authorization.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over a motion for authorization to file a successive petition pursuant to 28 U.S.C. § 2244(b)(3)(A). However, it is worth noting that, under Fifth Circuit Rule 8.10, if counsel for a death-sentenced inmate wishes to file a motion for authorization less than seven days before the scheduled execution, counsel must attach to the proposed filing a detailed explanation stating under oath the reason for the delay. Here, Howard filed the instant motion on October 1, 2026—a mere six days before the scheduled execution. In counsel's Rule 8.10 statement, counsel explain that they did not timely file, largely because they wanted to exhaust Howard's state remedies. But this explanation rings hollow, since Howard did not file his subsequent writ application in the state court until September 28, 2026—only three days before the instant motion. Howard's dilatoriness in seeking state court relief does not justify his dilatoriness in seeking federal relief. Furthermore, as

shown below, the cases and literature underlying the current iteration of Howard's *Atkins* claim have been available for years, and his execution has been set for over half a year. Howard's lack of alacrity should weigh heavily in the Court's balancing of the equities underlying Howard's stay request.

## STATEMENT OF THE ISSUE

Should the Court grant Howard authorization to file a successive habeas petition in the federal district court pursuant to 28 U.S.C. § 2244(b) for a time-barred claim that was available during his first federal habeas proceeding and where he fails to state a prima facie *Atkins* claim?

## STATEMENT OF THE CASE

### I. Facts of the Crime

The Texas Court of Criminal Appeals (CCA) summarized the facts of the murder as follows:

> [Howard] stole a gun from his grandfather the night before the murder and hid it. Despite his family's efforts to persuade him to turn over the gun, [Howard] refused. The following morning, [Howard] retrieved the gun and walked several blocks from his house to the Chevron store. After peering in the windows, he entered the store, went into the secured office area where the victim was sitting, cocked the gun, and shot the victim in the chest. [Howard] stole $114.00

> from the cash register and reached over the dying victim to steal a carton of cigarettes before leaving. The offense was recorded on videotape. [Howard] denied committing the offense until he was told it was videotaped. He told the officer who took his statement that he was not sorry for committing the offense.

*Howard v. State*, 153 S.W.3d 382, 383–84 (Tex. Crim. App. 2004).

## II. Punishment Evidence

The CCA summarized the evidence elicited at Howard's punishment trial:

> . . . [T]he State presented evidence that [Howard] demonstrated a disregard for authority and school rules despite the continued efforts of his mother and educators. During one incident, [Howard] punched a pregnant teacher in the chest with his fist when she asked him to return to his seat. When [Howard] was assigned to an alternative school, he refused to comply with its rules and standards, and he was defiant and disruptive. The State also presented evidence of [Howard's] possession of controlled substances, his fighting with police officers and resisting arrest, his committing several burglaries as a juvenile, and his fighting with other inmates. Dr. Edward Gripon testified for the State that [Howard] was not suffering from schizophrenia, but rather was suffering from antisocial personality disorder.

## III. Competency Evaluations at Trial

At arraignment, trial counsel Tyrone Moncrieff raised the issue of Howard's competency to stand trial after observing some "disturbing"

behavior. 2 RR[2] 48. From then on, the trial court went to great lengths to ensure that Howard was competent before proceeding with the trial on the merits. It approved Howard's absence during voir dire one day on Moncriffe's report that he was "speaking to himself" and "laughing involuntarily." 13 RR 1. And it appointed an independent psychologist to assess Howard's capacity to understand the proceedings against him and communicate with counsel. *See* 2 RR 48–53 (appointing psychologist). When that expert found Howard's competency "questionable," the court set a competency hearing. 21 RR 42–43, 48–53. And when that hearing ended with a deadlocked jury, the court set the next. *See* 30 RR 36–41.

In addition to the court-appointed psychologist who evaluated Howard, both parties had their own experts—one for the defense and two for the state—evaluate Howard's capacity as well. Four experts, then, wrote reports and testified in one or both of the competency hearings that followed. *See* 29 RR; 31 RR; 32 RR; 34 RR 95–97 (DX 1) 98–99 (DX 2). Where Texas law recognizes both intellectual disability and mental

---

2 The Director employs the following citation conventions: "CR" refers to the clerk's record of pleadings and documents filed during Howard's capital murder trial. "RR" refers to the reporter's record of transcribed trial proceedings. "DX" refers to the defense's trial exhibits. "SHCR–01" refers to the clerk's record of pleadings and documents filed during Howard's initial state habeas proceeding. All references are preceded by volume number and followed by page number where applicable.

illness as potential sources of incompetence,[3] all four experts homed in on Howard's mental illness, with one diagnosing him with schizophrenia, 34 RR 99 (DX2 at 2), and two suspecting as much, 29 RR 68–69. To the extent the experts' conclusions are relevant to the *Atkins* claim Howard would eventually raise on direct appeal and in initial state habeas proceedings—and abandon in federal habeas proceedings—they are summarized below.

### A. Dr. James Duncan: court-appointed clinical psychologist

On March 8, 2001, Dr. James Duncan interviewed Howard at the Hardin County Jail for an hour-and-a-half to two hours to assess his mental, emotional, and intellectual functioning. 21 RR 20–21; 34 RR 95 (DX 1 at 1). While "Howard was able to provide a reasonably detailed narrative of his involvement in the alleged incident" and "was aware of the specific charges against him . . . and the possible penalties involved," Dr. Duncan concluded that his "competency to stand trial . . . [was] questionable." 34 RR 96 (DX 1 at 2); 21 R.R. 29, 41–42. He explained that Howard's "responsiveness seemed inconsistent" and his "thought processes seemed impaired." 34 RR 95 (DX 1 at 1).

---

[3] *See* Tex. Code Crim. Proc. art. 46B.024 § 2(A)-(B).

And after administering some of the verbal subtests of the WAIS-IV, Dr. Duncan estimated Howard's intellectual functioning to be "in the borderline to mildly impaired range." 21 R.R. 26; 29 RR 66, 76; 34 RR 96 (DX 1 at 1).

> I would say in the range of 70; but because I didn't give the full test, that number would be - - there would be a range there. I would say that based on the - - scoring the subtest that I gave and figuring out that number, would be a 65 to 70 kind of IQ range.

29 RR 76. When asked whether he would expect someone in that range "to pass the TAAS test," as Howard did as "a sophomore or junior in high school," Dr. Duncan admitted that he would not. 29 RR 76. Eventually Reconciling Howard's early academic success with his presentation during their interview, the doctor explained:

> Given the available history, his intellectual functioning appears to have deteriorated from a previous level and is now in a range that would be considered mildly impaired. There is evidence of flattening or inappropriate affect. Although hallucinations were not acknowledged by Mr. Howard this examiner observed him responding to apparently internal stimuli.[4] Jail guards report similar behavior. His logic is unusual and at times unintelligible. Given Mr. Howard's age and the nature of symptoms displayed, he may well be exhibiting an emerging thought disorder possibly

4 Howard would suddenly smile or chuckle when there was no apparent reason to at times, which Dr. Duncan believed may have been responsive to an auditory hallucination. 21 RR 24–25; 34 RR 96–97 (DX 1); *see also* 29 RR 43.

> schizophrenia.[5] An organic condition of unknown origin also cannot be ruled out. Mr. Howard would appear to be in need of psychiatric treatment.

34 RR 96–97 (DX 1); *see also* 21 RR 26–42; 29 RR 43. Notably, at the same time, Dr. Duncan testified that Howard "knew right from wrong" when he murdered Vickie Swartout. 21 RR 32–35.

**a. Dr. Richard Fason: defense psychiatric expert**

Dr. Richard Fason conducted two clinical interviews of Howard on February 5 and April 10, 2001. 29 RR 106; 34 RR 98 (DX 2). In between the interviews, he reviewed Howard's school records and Drs. Duncan's and Fason's reports from their competency evaluations; he also consulted with Dr. Duncan, as well as Howard's counsel, mother, and therapist from adolescence. 29 RR 99–103; 34 RR 98 (DX 2 at 1).

From the interviews, Dr. Fason characterized Howard as "impenetrable," explaining that he wouldn't "let [Dr. Fason] see what he was thinking or what he was feeling." 29 RR 92. The doctor attempted to administer the Minnesota Multiphasic Personality Inventory 2 (MMPI-2) test but was unable because Howard "couldn't manage" the

[5] The timing of the onset of Howard's symptoms was significant because it aligned with the expected onset of same for a person with schizophrenia. 29 RR 69, 77.

vocabulary, specifically, "the word[s] 'mechanics' . . . and 'appetite.'" 29 RR 90. While Dr. Fason had doubts about Howard's credibility, SHCR-01 at 125, his poor vocabulary raised questions about intellectual disability. 29 RR 91–92. But after reviewing Howard's school records and interviewing his mother and defense counsel, Dr. Fason discovered that Howard had started out in school as a very bright student. 29 RR 95–103; 34 RR 98 (DX 2 at 1). Specifically, in second grade, Howard was in the ninetieth percentile in math but dropped to the thirtieth percentile in fifth grade. 29 RR 98–99; 34 RR 98 (DX 2 at 99). Dr. Fason theorized that Howard's declining performance in school was due to schizophrenia. 29 RR 106–08.

Based on his evaluation and review, Dr. Fason concluded:

> Howard is suffering from a form of Schizophrenia that markedly impairs his ability to have a rational understanding of the charges . . . and consequences if convicted. Additionally, he does not possess the ability to cooperate . . . and communicate with his attorney in planning his defense. [T]herefore, he should be considered incompetent to stand trial.

34 RR 99 (DX2 at 2). Dr. Fason further opined that, if treated with antipsychotics, Howard's restoration to competency was likely possible. 34 RR 99. (DX 2).

**b. Dr. Ned Groves: state psychiatric expert**

Dr. Ned Groves, evaluated Howard on March 30, 2001, at the Hardin County Jail. 1 CR 138. He also interviewed a jailer about Howard's behavior. 1 CR 138.

After evaluating Howard, Dr. Groves realized that he had met Howard five years prior, when he was 15 years old, at the Texas Rehabilitation Commission's request for a determination of disability, related to his Attention Deficit Hyperactivity Disorder (ADHD). 29 RR 128.[6] Dr. Groves's notes from the 1995 evaluation reflected that Howard had been an A student into third grade, before his grades plummeted to Ds and Fs. Placed in a specialized learning environment for fourth grade, his academic performance improved some. 29 RR 130. But by fifth grade, Howard's grades started to decline alongside his behavior. 29 RR 130. It was then that Howard was first diagnosed and treated for ADHD. During the time he was treated for ADHD, Howard's mother reported that "It was an overnight change": "[H]e was able to conform his behavior," and "[h]is grades went back to being all As." 29 RR 130. "[T]hings remained

[6] Dr. Groves explained that his role as the examiner was "to do an evaluation and send the report to the State of Texas" for a decision on whether his disability was sufficient to warrant a monetary benefit. 29 RR 129.

fairly well" while "he was taking the medication." 29 RR 130. But by eighth grade or just after, he stopped taking the medication. 29 RR 131.

From his 2001 evaluation, Dr. Groves found that Howard's "cognitive exam was notable for limited effort, if any." 1 CR 140. Howard was "extremely disinterested and frankly bored with the process." 1 CR 140. Referencing Dr. Fason's testimony and the jailer's report of Howard's behavior, Dr. Groves acknowledged that "[t]here were some subtle clues that might be suggestive of a thought disorder or a schizophrenic type problem." 29 RR 123, 139–40, 142. But he was unable "to make a specific diagnosis of schizophrenia at [the] time." 29 RR 123. Notably, Dr. Groves perceived Howard's "vagueness and superficiality" during the interview to be "volitional," 29 RR 132, and speculated that some of Howard's behaviors may have been symptoms of antisocial personality disorder, 29 RR 133–34. In any event, Dr. Groves explained that neither schizophrenia nor ADHD provided a sufficient basis for incompetency. 29 RR 132; 32 RR 26–28, 31. From there, he found Howard competent to stand trial. 1 CR 141.

**c. Dr. Edward Gripon**

The state's psychiatric expert, Dr. Gripon, evaluated Howard for an hour-and-a-half on April 10, 2001. 2 CR 213. Based on his conversation with Howard, Dr. Gripon "estimate[d] his intelligence as low average to borderline." 2 CR 216. He diagnosed Howard as having antisocial personality disorder, rather than schizophrenia. 23 RR 113–18, 26 RR 112–14; 2 CR 217 (explaining that "simple schizophrenia" is not recognized in the DSM-IV and that Howard's symptoms do not meet the criteria for any of the five DSM-endorsed subtypes).

## IV. Procedural History

Howard was convicted and sentenced to death for the murder of Vickie Swartout. 3 CR 578; 24 RR 53–55; 27 RR 58–64. On direct appeal, the CCA rejected Howard's *Atkins* claim, *inter alia*, to uphold his conviction and sentence. *Howard v. State*, 153 S.W.3d at 383–84.

While his direct appeal was pending, Howard filed a state application for a writ of habeas corpus raising his *Atkins* claim, *inter alia*, again. SHCR-01 at 21–123. The trial court issued findings of fact and conclusions of law recommending that the CCA deny relief. Supp. SHCR-01 at 20–38. And on December 12, 2012, the CCA did. *Ex parte Howard*,

No. WR-77,906-01, 2012 WL 6200688, at *1 (Tex. Crim. App. Dec. 12, 2012).

On December 12, 2012, Howard filed a federal habeas petition in the district court, raising his *Atkins* claim, among others. DE 16.[7] Over the next four-and-a-half years, Howard would request $70.912.50 in funding to develop the claim that he now says was never feasible at that time. *See* Motion for Order Authorizing Consideration of Second Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2244 and for Stay of Execution (Mot.) 1, 8 n.3; DE 14 ($7,500); DE 23 ($14,000) (DE 44 ($8,000); DE 50 ($10,062.5); DE 66($5,000); DE 71 ($5,000); DE 74 ($21,350). Having been granted $36,000 of his ask, Howard was authorized to retain a team of three *Atkins* experts to develop the claim he now suggests was futile. *See* DE 75 at 2

In 2015, the team's psychiatrist, Dr. Woods, diagnosed Howard with intellectual disability "to a reasonable degree of medical certainty," albeit without administering any IQ or adaptive-deficit tests. DE 76-14. But with the onboarding of two additional experts who were qualified to

[7] "DE" refers to docket entries on the federal habeas court's electronic docket sheet, available on PACER in Eastern District cause number 1:13-cv-256.

administer the tests necessary to sustain an *Atkins* claim, Howard was finally tested. *See* DE 44. And five-and-a-half months after the Supreme Court issued *Moore I*, Howard's team of experts finally revealed the results: "Howard does not have intellectual disability." *See* DE 74 at 2–3 (filed on September 12, 2017 filing date); *Moore v. Texas*, *(Moore I)*, 581 U.S. 1 (2017) (issued on March 28). After the Supreme Court overturned the CCA for applying *Briseno*'s "superseded medical standards" to adjudicate *Atkins* claims, Howard made the choice to abandon his intellectual-disability claim. *See Moore I*, 581 U.S. at 11–12; *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004).

Two years later, the district court issued an order denying relief on Howard's remaining claims. *Howard v. Stephens*, No. 1:13-cv-256, 2019 WL 4573640 (E.D. Tex. 2019); DE 75. Howard filed an application for certificate of appealability (COA), in which he curiously updated the Court in a footnote about precedent related to his abandoned *Atkins* claim:

> This case was tried pre-*Atkins*, although appellate counsel cited [*Atkins*,] as supplemental authority regarding a claim submitted of intellectual disability on direct appeal. The [CCA] rejected the claim under *Ex parte Briseno,* 135 S.W. 3d, 1, 5 (Tex. Crim. App. 2004) (The *Briseno* holding was specifically rejected in [*Moore I*].

*See* COA App. at 11 n.5. This Court denied Howard's application for a COA. *Howard v. Davis*, 959 F.3d 168 (5th Cir. 2020). And the Supreme Court denied certiorari. *Howard v. Lumpkin*, 592 U.S. 1180 (2021).

On March 26, 2026, the 356th District Court of Hardin County, Texas, scheduled Howard for execution on Wednesday, October 7, 2026. Seven months after the 356th District Court issued its order—and nine days before his scheduled execution—Howard filed a subsequent writ in the CCA reasserting the *Atkins* claim that he had abandoned in September 2017, along with a motion to stay his execution. Both remain pending in the CCA.

Three days later, and six days before his scheduled execution, Howard filed in this Court the instant a motion for authorization to file a successive *Atkins* petition and, because of his timing on that, an accompanying motion for stay of execution.

## SUMMARY OF THE ARGUMENT

Howard is not entitled to authorization under § 2244(b) because he raised his *Atkins* claim in his initial petition before abandoning it and because he fails to show any of his proposed claims rely on a new, retroactively applied rule of constitutional law. Moreover, his proposed

*Atkins* claim does not state a prima facie claim for relief and it categorically fails to satisfy § 2244(b)(2)(B). Howard's proposed claims are also significantly untimely, and he fails to demonstrate entitlement to equitable tolling. *See* § 2244(d)(1). Accordingly, this Court should deny Howard's motion for authorization.

## STANDARD OF REVIEW

A habeas petitioner must "obtain leave from the court of appeals before filing a second habeas petition in the district court." *Adams v. Thaler*, 679 F.3d 312, 321 (5th Cir. 2012); *see Felker v. Turpin*, 518 U.S. 651, 664 (1996); 28 U.S.C. § 2244(b)(3)(A). Under § 2244(b),

> (1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.
>
> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—
>
> > (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (B)

> (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the Applicant guilty of the underlying offense.

28 U.S.C. § 2244(b). As discussed below, Howard's Motion fails to make a prima facie showing that he satisfies the requirements of § 2244(b). *See* 28 U.S.C. § 2244(b)(3)(C).

## ARGUMENT

### I. The Statute of Limitations Precludes Authorization.

While Howard cannot overcome § 2244(b)'s bar on successive petitions, § 2244(d) provides a more compelling reason—and less complicated way—to get to denial. Declining to engage this Court in his timeliness inquiry, Howard promises to show the district court that he is entitled to equitable tolling because he "has been pursuing his rights diligently." Mot. 25 (quoting *Holland v. Florida*, 560 U.S. 631, 649

(2010)). And in conclusion, he rattles off five events—dated by year—that he suggests trigger the limitations period. Mot. 25–26.

But this Court has "the authority to deny a motion to authorize based on timeliness." *In re Campbell*, 750 F.3d at 532 n.9; *see also Henderson v. Thaler*, 626 F.3d 773, 781 (5th Cir. 2010). And for the reasons it did so in *Burton*, it should here, too. *See In re Burton*, 111 F. 4th 664, 666 (5th Cir. 2024); *see also In re Sparks*, 939 F.3d 630, 632 (5th Cir. 2019); *In re Jones,* 998 F.3d 187, 189 (5th Cir. 2021).

Section 2244(d)(1) applies a one-year limitations period to any application for writ of habeas corpus. In this case, the limitations period begins running from the latest of either:

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1); *In re Jones,* 998 F.3d at 189.

In the context of AEDPA's[8] limitations on successive petitions, Howard asks the Court to authorize pursuant to § 2244(b)(2)(A) because his claim "relies on a new rule of constitutional law," *i.e.*, *Atkins*, "that was previously unavailable" (twenty-four years ago, anyway). Mot. 15. But because § 2244(d)(1)(C)'s corollary limitations provision required him to bring his claim "based on a new rule of constitutional law within one year of 'the date on which the constitutional right asserted was initially recognized by the Supreme Court,'" *Burton*, 111 F.4th at 666, his current *Atkins* claim is more than two decades late. *See Atkins*, 536 U.S. 304 (triggering one-year limitations period on June 20, 2002).[9]

So Howard mixes and matches AEDPA's provisions to assert that his "previously unavailable" *Atkins* claim, *see* Mot. 15, should be reviewed pursuant to § 2244(d)(1)(D)'s provision for claims whose factual

---

8 The Antiterrorism and Effective Death Penalty Act of 1996.

9 Howard does not argue that *Moore I* triggers the limitations period under § 2244(d)(1)(C). This Court has discounted the contention that *Moore I* "facilitated a successive *Atkins* claim," finding it "contradicts" *Shoop v. Hill*, 586 U.S. 45 (2019). *In re Sparks,* 939 F.3d at 632. But regardless, this Court held "the statutory time limit for asserting this claim is one year following *Moore"* and a delay in filing beyond the one-year statute of limitations recognized in § 2244(d)(1) is untimely. *Id.* at 632 (three-year delay post-*Moore* untimely); *see also In re Burton*, 111 F.4th at 666; *In re Jones,* 998 F.3d at 189–90 (even considering *Moore v. Texas*, 586 U.S. 590 (2019) (*Moore II*), decided in 2019, petition filed in 2021 was untimely). Because the instant motion was not filed until 2026—nine-and-a-half years after *Moore I*—Howard's petition is clearly too late.

predicates were not previously discoverable with diligence. Mot. 25 (citing *Johnson*, 935 F.3d at 295–96). Relying on this Court's determination in *Johnson,* that the DSM-5's publication triggered the clock under subsection (D), Howard ups the ante with the five events that finally rendered his claim discoverable: (1) the AAIDD-12's publication on January 11, 2021; (2) the DSM-5-TR's publication on March 18, 2022; (3) the CCA's acknowledgement in *Ex parte Estrada*[10] that the AAIDD extended the developmental period to 22 in April 2025; (4) the CCA's acknowledgement in *Ex parte Mays*[11] that the DSM-5-TR abandoned the relatedness requirement in March 2024; and, finally, (5) the APA's issuance of its guidelines in August 2026. Mot. 25–26. The Director will address these events in reverse order.

Howard's reliance on the APA's most recent forensic guidelines appears more opportunistic than substantive. As discussed above, Dr. Patton was one of three experts in federal habeas proceedings who concluded in 2017 that Howard was not intellectually disabled. Now Howard asserts that, "[c]onsistent with the APA's recently issued

---

10 No. 53,499-02, 2025 WL 1122323, at *1 n.2 (Tex. Crim. App. 2025).

11 686 S.W.3d at 748 n.5 (Tex. Crim. 2024).

forensic guidelines," Dr. Patton believed that "observation of deficits at multiple points in the developmental period" was necessary to satisfy the adaptive-deficit prong for intellectual disability. Mot. 16 (citing APA, Guidelines on Diagnosis of Intellectual Disability in Forensic Settings, Guidelines 6.2, 6.6 (Aug. 2026)). That one of Dr. Patton's obstacles to diagnosis in 2017 has since been substantiated, nine years later, in the APA's official guidelines does not help Howard. To the contrary, it reflects that Dr. Patton's understanding of this discrete aspect of the framework in 2017 remains correct today. As the 2026 guidelines substantiate—not undermine—Dr. Patton's procedure and conclusion, it remains unclear how their publication suddenly rendered his *Atkins* claim discoverable two months ago. Moreover, to the extent that the Guidelines extending the age of onset prong to 22 somehow made Howard's claim more feasible, the age was already raised by the AAIDD-12 in 2021. *Ex parte Estrada*, 2025 WL 1122323, at *1.

Howard's reliance on the CCA's footnotes in *Estrada* and *Mays* is more of the same. That a state court's acknowledgment of various alterations in various diagnostic frameworks might somehow supply a factual predicate date for an *Atkins* claim is not only unsupported, but

disingenuous.[12] The footnote Howard references from *Estrada* merely acknowledges that DSM-5-TR's and the AAIDD-12's definitions for the developmental period are different, with the former capping it at age 18 and the latter, 22. *See* 2025 WL 1122323, at *1 n.2. The CCA's discussion of the various frameworks it must reconcile or choose between neither makes Howard's federal *Atkins* claim more viable, nor changes the "gray area of previous unavailability" therefore. *See Cathey*, 857 F.3d at 230. In any event, *Estrada* and *Mays* are also dated more than one year before Howard filed his application.

Because the Court found that the DSM-5's publication date implicated § 2244(d)(1)(D) in *Johnson*, 935 F.3d at 295–96, the Director assumes it may do so again here. But Howard's claim is time barred, even so. Because the DSM-5-TR's release provides a later date than that of the AAIDD-12, the Director assumes the former as the triggering event. If the Court finds that Howard's current *Atkins* claim only became discoverable with the DSM-5-TR's release on March 18, 2022, then he

---

[12] Not even *In re Johnson*, the apparent inspiration for Howard's assertion that CCA opinions trigger the limitations period under subsection (D), supports such a contention. *See* 935 F.3d at 295–96; Mot. 25.

had until March 18, 2023, to raise it. His instant motion, filed October 1, 2026, is therefore three-and-a-half years too late.

Howard's proclamation of diligence is not sufficient for the equitable tolling he needs. *See* Mot. at 25. He has been afforded all the process he is due, and more. This Court together with the district court, authorized $36,000 of funding for Howard to develop the factual predicate of his claim.

Accordingly, this Court should deny Howard's motion for authorization because his *Atkins* claim is time barred.

## II. Howard's Motion Does Not Meet the Standards Under 28 U.S.C. § 2244 for Filing a Successive Habeas Corpus Petition.

Howard seeks authorization to raise the latest version of his *Atkins* claim based on a hodgepodge of "current clinical standards" that suit relief. Mot. 17–18. Section 2244(b) bars his motion for authorization at every subsection, however.

Before authorizing a successive petition in the lower court, this Court must determine that Howard satisfies the statutory prerequisites for a successive habeas petition. *In re Campbell*, 750 F.3d 523, 529–30 (5th Cir. 2014). If a claim has been previously raised, it must be dismissed—there are no exceptions. § 2244(b)(1); *Williams v. Thaler,* 602

F.3d 291, 301 (5th Cir. 2010). If a claim has not been previously raised, it also must be dismissed, unless the movant makes a prima facie showing that his claim: (A) "relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or (B) relies on facts that (i) could not have been discovered previously through the exercise of due diligence, and (ii) if proven would "establish by clear and convincing evidence that, but for Constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense." § 2244(b)(2)(A)–(B); *In re Johnson,* 935 F.3d 284, 291 (5th Cir. 2019); *In re Cathey*, 857 F.3d 221, 226 (5th Cir. 2017). Howard cannot meet any of these standards.

### A. Howard's presentation of his *Atkins* claim "in a prior application" implicates § 2244(b)(1)'s absolute bar against successive petitions.

Attempting to circumvent § 2244(b)(1)'s absolute bar, Howard urges the Court to find that he did not "present[] in a prior application" the *Atkins* claim that he, in fact, did. Mot. 13–14; DE 76 at 23–51; DE 14; DE 23; DE 44; DE 50; DE 66; DE 71; DE 74. As support for overriding the statute's plain language, Howard offers that he withdrew the claim before it was adjudicated and that the version he asserts today is

"fundamentally different from the one [he] abandoned." Mot. 13–14. But precedent instructs that § 2244(b) is to be interpreted according to its plain language. *Gonzalez v. Crosby*, 545 U.S. 524, 533 (2005) (reiterating that § 2244(b) is to be interpreted according to its "actual text");

Howard's first argument—that he avoids § 2244(b)(1) because he withdrew the *Atkins* claim before the lower court adjudicated it—is unsupported in law. Indeed, this case is distinct from the primary authority Howard relies upon in this regard: Neither Johnson nor Cathey raised an *Atkins* claim in his initial writ; only Howard did.

According to this Court, § 2244(b)(1) "admits of no exceptions." *E.g.*, *In re Sharp*, 969 F.3d 527, 528 (5th Cir. 2020); *United States v. Vargas-Soto*, 35 F.4th 979, 987 (stating that § 2244(b)(1) "bars—with no exceptions—any claim 'that was presented in a prior application'"); *see also* Brian R. Means, Federal Habeas Manual, § 11:22 (2025 ed.) ("Generally, this is an absolute bar against raising in a . . . successive habeas corpus application a claim that was presented in a prior application.").

Confronting this question, the Seventh Circuit rejected petitioner's argument that § 2244(b)(1) did not apply to a claim he raised in his initial

application because he abandoned it due to futility before it was adjudicated. *Felder v. McVicar*, 113 F.3d 696, 698 (7th Cir. 1997); *cf. Montgomery v. Goodwin*, 841 F App'x 700 (5th Cir. 2021) (holding that a subsequent petition asserting a previously raised but abandoned claim was successive for purposes of § 2244(b)(3)); *Burton v. Stewart*, 549 US 147 (2007) ("There is no basis in our cases for supposing, as the Ninth Circuit did, that a petitioner with unexhausted claims who . . . elects to proceed to adjudication of his exhausted claims . . . may later assert that a subsequent petition is not 'second or successive' precisely because his new claims were unexhausted at the time he filed his first petition."). It reiterated, per § 2244(b)(1), "[a] claim that has been presented in the first petition cannot be presented in a second. Period." *McVicar*, 113 F.3d at 698. And according to the Supreme Court, neither it nor its lower courts have the "authority to amend" AEDPA's provisions: "Where Congress has erected a constitutionally valid barrier to relief, a court *cannot* decline to give it effect." *Shinn v. Ramirez*, 596 U.S. 366, 385 (2022).

But even if this Court could decline to apply § 2244(b)(1), there are additional reasons not to in this case. While Howard's *Atkins* claim ultimately was not adjudicated in federal proceedings, it was extensively

funded, extensively developed, and extensively briefed in the district court. That Howard chose to abandon the claim before the judge could reject it should not make it easier for him to do it all over again. As he received far more than the average petitioner who merely sees his claim to adjudication, § 2244(b)(1)'s should preclude Howard the same.

Howard's second argument—that the Court should disregard § 2244(b)(1) because his *Atkins* claim today is "fundamentally different" than the one he abandoned—fares no better. In addition to being foreclosed by precedent,[13] the exception Howard needs here would invite gamesmanship in last-minute litigation, particularly in the context of *Atkins*'s ever-evolving framework: If a petitioner knew he could avoid § 2244(b)(1)'s absolute bar by sandbagging his then-fulile *Atkins* claim to assert it a decade later under the latest framework, he would always be wise to do so. For the medical community's continued and competing revisions to the definition of intellectual disability underscore that

[13] *See, e.g.*, *In re Coleman*, 768 F.3d 367 (5th Cir. 2014) (holding that new factual support for a previously presented claim does not save it from § 2244(b)(1)'s absolute bar). This Court has held that factual exhaustion caselaw does not apply in the successiveness context. *In re Young*, 789 F.3d 518, 526 n.2 (5th Cir. 2015). And even if it did, it would have to go to a "previously unraised substantive area." *Id.*

tomorrow's *Atkins* claim will almost always be a better bet than yesterday's.[14]

Because Howard raised his *Atkins* claim in "a prior application," § 2244(b)(1) bars him from presenting it in a second. There are no existing exceptions, and this Court should refrain from writing a new one at this time.

### B. Alternatively, Howard's *Atkins* claim is barred by § 2244(b)(2)(A) because it does not rely on a new retroactive rule of constitutional law.

Howard asserts that his "claim relies on a new rule of constitutional law, made retroactive by the Supreme Court, that was previously unavailable." Mot. 15. Specifically, Howard relies on *In re Johnson* and *In re Cathey* to argue that, although he pursued an *Atkins* claim for fifteen years in state and federal proceedings, he required the updated DSM-5-TR and the AAIDD-12 to effectively prove it. Mot. 15–19. While it is unclear whether *Johnson* will remain good law with the Supreme

14 *See, e.g., Ex parte Mays*, 686 S.W.3d 745, 750 n.1 (Tex. Crim. App. 2024) (Yeary, J., dissenting) ("The criteria for discerning a diagnosis of intellectual disability have changed incrementally with each passing edition of the DSM, and it has become at least marginally less burdensome for applicants to satisfy the criteria with each successive manual.

Court's recent certiorari grant, 146 S. Ct. 2725 (2025), it does not matter here because *Johnson* is distinguishable from Howard's case.

When the Supreme Court decided *Atkins*, it did not offer a legal definition of intellectual disability, nor did it mandate the use of any particular medical guideline in determining intellectual disability. In *Hall v. Florida*, 572 U.S. 701, 710 (2014), the Court provided that "[t]his Court, state courts, and state legislatures consult and are informed by the work of medical experts in determining intellectual disability[.]" The Court then observed that "the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of those deficits during the developmental period." *Id*. at 710. But, as in *Atkins*, the Supreme Court did not mandate the use of any particular medical guideline in determining intellectual disability. In *Moore I*, the Supreme Court affirmed its prior holding in *Hall* that the habeas court use the most recent medical guidelines in determining intellectual disability. 581 U.S. at 13–14. And, as in *Atkins* and *Hall*, the Court in *Moore* did not mandate the use of any particular medical

guideline in determining intellectual disability. The CCA in *Moore I* was reversed for not employing "the intellectual-disability guides currently used in the medical community" and for employing "the 1992 guides adopted by the CCA" in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004), and for relying upon "superseded medical standards." *Moore I*, 581 U.S. 1 U.S. at 12.

As *Atkins*, *Hall*, and *Moore I* were all available to Howard when he filed his amended petition, he evidently decided the CCA's adjudication of his *Atkins* claim was constitutional enough to let it lie. Unable to show the "previous unavailability" of any of the Court's intellectual disability cases, Howard does not try. Relying on *Johnson* and *Cathey* instead, Howard attempts to overcome § 2244(b)(2)(A) with diagnostic frameworks that are neither constitutional, law, nor retroactive per the Supreme Court. He alleges that he could not have raised his current claim at any time prior to the AAIDD-12's and DSM-5-TR's publications, which he says, "changed the framework for evaluating adaptive deficits and their onset." Mot. 15–19. According to Howard, his previously-futile *Atkins* claim became viable when the DSM-5-TR removed the requirement that "deficits in adaptive functioning . . . be directly related

to the intellectual impairment" and the AAIDD-12 expanded the developmental period for onset to age 22. Mot. 17–18. But his reliance on *Johnson* and *Cathey* is misplaced.

In *Johnson* and *Cathey*, the petitioners filed their initial federal petitions after *Atkins* but did not raise *Atkins* claims, despite some evidence supporting such claims. *In re Johnson*, 935 F.3d at 287, 292; *In re Cathey*, 857 F.3d at 227. When they later sought authorization to raise their *Atkins* claims in successive petitions, they asserted the claims were "previously unavailable" because, under the earlier understandings of the diagnostic criteria for intellectual disability, their claims would have been futile—specifically, their IQ scores were too high for a finding of intellectual disability under prior criteria. *In re Johnson*, 935 F.3d at 292-–93 (six years after conviction, new DSM-5 recognized IQ score over 70 may still qualify as intellectually disabled); *In re Cathey*, 857 F.3d at 229–33, 237–38 (Cathey's pre-trial 77 IQ score too high for intellectual disability, but discovery of purported 73 IQ score twelve years after conviction, court recognition of Flynn Effect nine years after conviction, and Supreme Court's 2014 rejection of 70 IQ score as ceiling for intellectual disability, rendered *Atkins* claim newly available). Moreover,

Johnson presented a newly obtained IQ score of 70 in support of his request for authorization. *In re Johnson*, 935 F.3d at 292. Based on the change in diagnostic criteria—and subsequent change in the legal framework for reviewing *Atkins* claims—this Court found the petitioners' claims were "previously unavailable" and, thus, satisfied subsection § 2244 (b)(2)(A). *In re Johnson*, 935 F.3d at 292; *see also In re Soliz*, 938 F.3d 200, 203 (5th Cir. 2019) (discussing *In re Johnson* and *In re Cathey*).

However, the *Johnson* Court specifically acknowledged that the finding of a later claim of possible merit in *Cathey* "was more than just a reassessment by medical professionals of this inmate's particular mental abilities. The significant change was in the medical methodology for evaluating the relevant disabilities." *In re Johnson,* 935 F.3d at 292–93.

Howard's current *Atkins* claim is distinct. Where the rigid framework that preceded Johnson's and Cathey's claims all but ensured their high IQ scores would foreclose consideration of any additional evidence, the DSM-V's and the Supreme Court's repudiation of the over-reliance on IQ scores changed that. *Hall*, 572 U.S. 701. Howard, on the other hand, asks this Court to fuse the recent changes in the DSM-5-TR that suit him, together with the same from AAIDD-12. While the Director

concedes that the DSM-5-TR and the AAIDD-12 are current and informed by medical standards, Howard's self-serving mashup of these competing diagnostic frameworks does not obligate any court to apply it.

Howard's interpretation of the noted changes is also flawed. He suggests that the DSM-5-TR's abandonment of the relatedness requirement means that all of his symptoms or deficits—regardless of their source—may be pooled to prove up intellectual disability. But a closer look reveals that the manual maintains its commitment to separating co-occurring disorders, rather than blending them together to manufacture a secondary diagnosis.

The DSM-5-TR classifies intellectual disability as a "neurodevelopmental disorder," which "typically manifest early in development, often before the child enters school, and [is] characterized by developmental deficits or differences in brain processes *that produce* impairments of personal, social, academic, or occupational functioning." *Id.* at 35 (emphasis added). "[I]ntellectual disability" is "characterized by

deficits in general mental abilities [that] . . . *result* in impairments in adaptive functioning." *Id.* (emphasis added).

To demarcate "various levels of severity," the manual uses the "specifiers": "mild, moderate, and severe." *Id.* at 38. Mild intellectual disability is distinct from "borderline intellectual functioning." *Id.* "[B]ut differentiating the two "requires careful assessment of intellectual and adaptive functions and their discrepancies, particularly in the presence of co-occurring mental disorders that may affect patient compliance with standardized testing procedures (e.g., schizophrenia or attention deficit / hyperactive disorder, with severe impulsivity)." *Id.* at 866. As schizophrenia also causes cognitive and functional decline, a neurodevelopmental diagnosis is inappropriate when the functional impairments are a secondary consequence of a post-developmental psychiatric illness, rather than a lifelong failure to meet baseline developmental milestones. *See id.* at 23. To account for the concerns about the validity of testing measures, the manual instructs clinicians to protect the diagnostic baseline by using their training and judgment to

interpret test scores and to corroborate results with cross-sectional histories from collateral sources. *Id.* at 38.

So while the removal of the relatedness requirement may lessen a clinician's burden to psychometrically prove that a specific lower IQ score is the "cause" of a specific adaptive deficit, it does not permit clinicians to dump active psychiatric symptoms into the adaptive-deficit criteria to support a diagnosis for intellectual disability.

Howard similarly overstates the impact of the AAIDD-12's expansion of the developmental period to open the door to permit consideration of his behavior at the time of the offense and during the trial. But he faces the same problem here. Like the DMS-5-TR, the AAIDD-12 guards against diagnostic overshadowing, providing a comprehensive framework on co-occurring disorders, or dual diagnoses. Evidence surrounding Howard's behavior at the time of the murder has not been overlooked. It just does not show what Howard wants it to.

The latest editions of the DSM-5TR and the AAIDD-12 do not change the analysis because Howard was demonstrating symptoms of psychosis, not intellectual disability. And the to extent Howard suggest that his behavior in prison might provide support for his diagnosis, the

DSM-5-TR reflects that such evidence should be review with caution. DSM-TR-5 at 38 "Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers)."

Ultimately, the subtle shifts in the frameworks do not change the analysis for Howard, much less represent retroactive constitutional law. Accordingly, Howard's *Atkins* claim fails to satisfy § 2244(b)(2)(A), and this Court should deny his motion for authorization.

**C. Howard's claim fails on the merits.**

To obtain authorization to raise a successive *Atkins* claim, Howard must also make a prima facie showing that he is intellectually disabled. *See In re Campbell,* 750 F.3d at 530. Howard has presented the instant *Atkins* claim in state court. It remains pending, but once it is resolved, it will constitute an adjudication on the merits and, thus, subject to AEDPA's relitigation bar. *Busby v. Davis,* 925 F.3d 699, 709 (5th Cir. 2019) (citing *Ex parte Blue,* 230 S.W.3d 151, 163 (Tex. Crim. App. 2007)). Therefore, the CCA's *Atkins* ruling is ultimately subject to AEDPA's relitigation bar. *Id.* at 710–11.

To demonstrate he is intellectually disabled and thus ineligible for execution, Howard must show: (1) he has deficits in intellectual

functioning; (2) he has deficits in adaptive functioning; and (3) the onset of these deficits occurred during childhood or adolescence. *Moore I*, 581 U.S. at 7; *Petetan v. State*, 622 S.W.3d 321, 333 (Tex. Crim. App. 2021).

In support of his claim in state court, Howard pointed to an IQ score of 74, which was obtained in 2017 to support his *Atkins* claim before he abandoned it. *See* Sub. Writ Ex. 2 at 5. He also presented a report from Dr. Richard Temple who stated application of the Flynn Effect to Howard's score of 74 would adjust the score downward at least to 71, and the score could be, accounting for the lower end of the standard error of measurement, possibly as low as 67. Sub Writ, Ex. 2 at 5. Dr. Temple indicated that Howard's adaptive-behavior "was outside the scope of [his] evaluation." Sub. Writ, Ex. 2 at 7. Dr. Temple's "analysis of available school records indicate[d] inconsistent, below-average performance in multiple domains, suggested that the onset of intellectual difficulties in the developmental period." Sub. Writ, Ex. 2 at 7. He further noted that "there is no report or evidence of discrete injuries or illnesses in adulthood that could account for the observed weaknesses." Sub. Writ, Ex. 2 at 7. Based on his evaluation, Dr. Temple concluded, "within a reasonable degree of psychiatric certainty, that . . . Howard suffers from

Intellectual Disability that has been present throughout his life and continues to adversely affect him today." Sub. Writ, Ex. 2 at 7.

Additionally, a report from psychiatric expert Dr. George Woods was submitted in state court. He interviewed Howard and conducted neuropsychological testing; he also reviewed his school records. Dr. Woods "surmise[d] from [Howard's] academic scores and behavior that he had a long history of cognitive deficits before the onset of his psychosis." Sub. Writ, Ex. 4 at 13. With respect to adaptive functioning, Dr. Woods found that Howard's "academic impediments alone would meet the adaptive dysfunction criteria." Sub. Writ, Ex. 4 at 16. Ultimately, however, Dr. Woods concluded that Howard was impaired in all three domains of adaptive functioning." Sub. Writ, Ex. 4 at 19. Finally, Dr. Woods found that Howard's intellectual disability occurred in the developmental period." Sub. Writ, Ex. 4 at 20. In conclusion, Dr. Woods stated that it was his "professional opinion, which [he] held to a reasonable degree of neuropsychiatric certainty, that further evaluation of . . . Howard's Intellectual Disability should be undertaken to corroborate [his] diagnosis of intellectual disability." Sub. Writ, Ex. 4 at 20.

Having diagnosed Howard with intellectual disability, Dr. Woods went on to summarize the relationship between intellectual disability and schizophrenia, explaining that "[d]iagnostic accuracy is paramount in determining psychotic illnesses, particularly schizophrenia, among the persons with [intellectual disability]." Sub. Writ, Ex. 4 at 17. Assessing Howard in that framework, Dr. Woods noted that he had "two specific periods of deterioration" that helped "differentiate between the two comorbid disorders." Sub. Writ, Ex. 4 at 18. He attributed the first deterioration, which was in early childhood, to intellectual disability, and the second, which was in his adolescence, to the prodromal phase of schizophrenia. Sub. Writ, Ex. 4 at 18. According to Dr. Woods, "There is a clear distinction between his two disorders in spite of the severity of both his schizophrenia and intellectual disability." Sub. Writ, Ex. 4 at 18.[15]

After Drs. Woods and Temple wrote their reports, however, a third expert, Dr. Patton evaluated Howard to assess his adaptive behavior. Howard did not submit any of Dr. Patton's reports or notes in state court,

---

[15] In addition, Dr. James Duncan's notes from his pretrial evaluation of Howard in 2001 were submitted to the state court, Sub. Writ, Ex. 1, along with declarations from Howard's mother, sister, and close family friend, detailing their observations of Howard from childhood to his arrest. Sub. Writ, Exs. 5, 6, 7.

however. While it is not entirely clear why, after "additional diagnostic procedures, neuropsychological testing and adaptive behavior measures were conducted," Dr. Temple, along with Drs. Patton and Woods, "concluded that an [intellectual disability] claim was not feasible." DE 74 at 2. Howard's evidence does not present a prima facie claim for intellectual disability.

Under the DSM-5-TR, individuals with intellectual disability have scores approximately two standard deviations or more below the population mean, including a margin for measurement error. DSM-5-TR at 42; *see In re Cathey*, 857 F.3d at 236. In *Moore*, the Court reiterated that, per *Hall*, "where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits," adaptive deficits must then be considered. *See Moore I*, 581 U.S. at 14.

Howard received a composite score of 74 on the Wechsler Adult Intelligence Scale-IV (WAIS-IV) when he was tested in 2017. Mot. 20. When adjusted for the standard error of measurement, Howard's testing data indicates that his full-scale IQ is in the range of 70 to 79, at a 95%

confidence level. Mot. 20. This places him in the 4th percentile, i.e., "borderline" Sub. Writ, Ex. 2 at 5.[16]

This Court has held and that a petitioner could not demonstrate a subaverage intellectual functioning when the lowest IQ score he provided was a 74 on the WAIS IV (yielding a range from 70 to 79), which the test's administrator described as "borderline." *Busby*, 925 F.3d at 716–20. This Court stated that reason alone was enough to foreclose relief on the *Atkins* claim. *Id.* The same is true here.

As for the Flynn Effect, adjustment of IQ scores is not required. The Flynn Effect posits that over time, IQ scores of a population rise without corresponding increases in intelligence and, thus, the test must be re-normed. *In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007). The Flynn Effect "may affect" a test score. DSM-5-TR at 38; *see Ex parte Cathey*, 451 S.W.3d 12–14 (Tex. Crim. App. 2015). Importantly, though, the DSM-5-TR does not require adjusting a score downward for the Flynn Effect. DSM-5-TR at 38. Additionally, Texas law holds that an IQ score "may not

---

[16] Howard also offers Dr. Duncan's 2001 estimation of his IQ as support for the intellectual functioning prong. But the DSM-5-TR requires comprehensive tests warns against this sort of partial testing. DSM-5-TR at 37–43.

be changed" to adjust for the Flynn Effect. *Cathey*, 451 S.W.3d at 18.[17] Further, this Court "has not recognized the Flynn effect," *Brumfield v. Cain*, 808 F.3d 1041, 1060 n. 27 (5th Cir. 2015), and the Supreme Court has called it a "controversial theory." *Dunn v. Reeves*, 594 U.S. 731, 736–37 (2021) (per curiam).

With respect to adaptive deficits, the DSM-5-TR requires standardized tests of adaptive functioning to support a diagnosis for intellectual disability. DSM-5-TR at 38. So Howard proffers a one-page untitled, undated document that appears to be notes from Dr. Patton, who found that Howard did not meet the adaptive deficit criterion. *See* Mot. 10 (summarizing phone call with Dr. Patton). The notes reflect that what appears to be results from a retrospective ABAS-3 test for Howard. It states that Howard "does not demonstrate adaptive deficits prior to 15 and that the significant deficits thereafter "are strongly linked to the onset of his mental health issues." Movant's Exhibit 3. It further

---

[17] The CCA has noted that practice effects and the Flynn Effect "may affect test scores," *Petetan*, 622 S.W.3d at 338 (citing DSM-5 at 37), and courts "may consider the Flynn Effect and its possible impact on IQ scores generally" only "[w]hen it is impossible to retest using the most current IQ test available." *Ex parte Cathey*, 451 S.W.3d at 5, 18. And even then, courts "may consider that effect only in the way that they consider an IQ examiner's assessment of malingering, depression, lack of concentration, and so forth." *Id.* at 5.

indicates that Howard's mom's results from the ABAS-3 "provide powerful arguments about the impact of his mental health issues on functioning." *Id.* By his own evidence, Howard does not meet the adaptive deficit prong for intellectual disability.

So Howard attempts to overcome his expert's conclusion with declarations from his mother, sister, assistant principal from middle school, and family friend. *See* Mot. 21–24. But decades old recollections of Howard's behavior when he was a minor hardly provide an "objective" measurement of Howard's behavior. *See Ex parte Cathey*, 451 S.W.3d at 20 (recognizing that measurement of adaptive behavior was not designed to be administered retrospectively and was susceptible to reporters being "highly motivated to misremember"). After several years of trying, then, Howard still fails to make a prima facie showing of adaptive deficits. He also fails to account for the fact that three mental health experts who evaluated him at the time of trial suspected that schizophrenia was the reason for his aberrant behavior, with one making that diagnosis.

As for the final criterion, Dr. Patton's notes undermine Howard's argument that his deficits manifested during the developmental period, as they reflect that no significant adaptive deficits were observed before

the age of 15. And even if the developmental period were extended to age 22, Howard fails to refute opinion that any deficits were related to schizoaffective disorder, which experts who have examined him have noted.

Howard fails to present evidence that would support significantly subaverage intellectual or adaptive deficits. He therefore cannot make out a prima facie *Atkins* claim. His motion for authorization should be denied accordingly.

## III. This Court Should Deny Howard's Request for a Stay of Execution.

Howard asks this Court to stay his execution pending the Supreme Court's decision in *Guerrero v. Johnson*, No. 25-1003 (U.S. cert. granted June 15, 2026). But this Court has repeatedly and emphatically held that the Supreme Court's grant of certiorari in a capital case does not justify a stay of execution. *Cantu v. Collins*, 967 F.2d 1006 (5th Cir. 1992). Further, this Court's opinion in *Johnson* is the primary authority upon which Howard relies. While not sufficient to support relief, it is favorable to him. Thus, if the Supreme Court rejects the Director's appeal, the status quo favorable to Howard prevails. But, if the Supreme Court sides

for the Director, Howard will be in an even worse position. Either way, Howard does not benefit from this decision and no stay is warranted.

This Court should deny Howard's request for a stay of execution. A stay of execution "is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough,* 547 U.S. 573, 584 (2006) (citing *Nelson v. Campbell*, 541 U.S. 637, 649–50 (2004)). Rather, the inmate must satisfy all the requirements for a stay, including a showing of a significant possibility of success on the merits. *Id.* (citing *Barefoot v. Estelle*, 463 U.S. 880, 895–96 (1983)). When the requested relief is a stay of execution, a court must consider:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). A federal court must consider "the State's strong interest in proceeding with its judgment" and "attempt[s] at

manipulation." *Nelson*, 541 U.S. at 649–50 (citing *Gomez v. U.S. Dist. Court for Northern Dist of California,* 503 U.S. 653, 654 (1992)).

As demonstrated above, Howard fails to demonstrate a likelihood of success on either the motion for authorization or the underlying claims. First, Howard cannot demonstrate that he meets the statutory prerequisites for granting a motion for authorization. His *Atkins* claim does not rely upon a "new" rule of constitutional law, made retroactive to him by the Supreme Court. 28 U.S.C. § 2244(b)(2)(A). Indeed, *Atkins* was decided over twenty-four years ago, while *Moore I* was decided over nine years ago. His evidence falls far short of demonstrating he meets the requirements of a claim for intellectual disability. His score of 74, places him outside the range of intellectual disability, and he provides no objective measurement of his adaptive behavior. Howard's claim is impermissibly successive and time barred. In short, Howard cannot demonstrate the likelihood of success on either the motion for authorization or on the merits of his claim on appeal.

Further, "[b]oth the State and the victims of crimes have an important interest in the timely enforcement of a sentence." *Hill*, 547 U.S. at 584. Howard killed the Vickie Swartout in 2000 and was convicted

and sentenced to death in 2001. He exhaustively appealed his sentence through both state and federal court. His case sat dormant until an execution date was set five years later. Howard's last-minute attempt to revive his meritless *Atkins* claim that could and should have been raised long ago is plainly an effort to delay his sentence. Such dilatory tactics underscore why the court should deny this motion for stay. *See, e.g.*, *Bucklew v. Precythe*, 587 U.S. 119, 149–51 (2019). Howard presents no reason to delay his execution date any longer. The victim and her family deserve justice for his decades-old crime.

For the reasons argued above, this Court should deny the requested relief and a stay. Howard cannot overcome the strong presumption against granting a stay or demonstrate that the balance of equities entitles him to a stay of execution. For the same reason, Howard fails to show that he would suffer irreparable harm if denied a stay of execution. *Walker v. Epps*, 287 F. App'x 371, 375 (5th Cir. 2008) (explaining that "the merits of [the movant's] case are essential to [the court's] determination of whether he will suffer irreparable harm if a stay does not issue"). Howard cannot show he would be irreparably harmed if

denied additional process to which he has no entitlement. Howard's request for a stay of execution should be denied.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that this Court deny Howard's motion for authorization to file a successive federal petition.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

AMBER PLATT
Deputy Attorney General
for Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division

s/ Jennifer Wren
JENNIFER WREN
Assistant Attorney General
Texas Bar No. 24088680
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1600
Fax: (512) 320-8132
Email: jennifer.wren@oag.texas.gov

*Attorneys for Respondent*

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2026, I electronically filed the foregoing document with the clerk of the court for the United States Court of Appeals for the Fifth Circuit, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to counsel of record who has consented in writing to accept this Notice as service of this document by electronic means.

s/ Jennifer Wren
JENNIFER WREN
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that this Brief in Response complies with Federal Rule of Appellate Procedure 32(a) in that it contains 11,256 words. Microsoft Word, Century Schoolbook Font, 14 points.

s/ Jennifer Wren
JENNIFER WREN
Assistant Attorney General

## ELECTRONIC CASE FILING CERTIFICATIONS

I do hereby certify that: (1) all required privacy redactions have been made; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus scanning program and is free of viruses.

s/ Jennifer Wren
Jennifer Wren
Assistant Attorney General